```
               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK




----------------------------X
                            :
NILDA J. SUAREZ CASTANEDA,  :
et al.,                     :      17-CV-7603 (SJ)(PK)
              Plaintiff,     :
                            :      November 9, 2018
                            :
            V.              :      Brooklyn, New York
                            :
F&R CLEANING SERVICES CORP, :
et al.,                     :
              Defendant.    :
----------------------------X



           TRANSCRIPT OF CIVIL CAUSE FOR INQUEST
               BEFORE THE HONORABLE PEGGY KUO
               UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:        AARON SCHWEITZER, ESQ.




For the Defendant:


Audio Operator:


Court Transcriber:        ARIA SERVICES, INC.
                          c/o Elizabeth Barron
                          102 Sparrow Ridge Road
                          Carmel, NY 10512
                          (845) 260-1377




Proceedings recorded by electronic sound recording,
transcript produced by transcription service
```

```
1                    THE CLERK:  Civil cause for motion hearing,

2       docket number 17-CV-7603, Suarez Castaneda, et al. v.

3       F&R Cleaning Services Corp.

4                    Counsel, please state your name for the

5       record.

6                    MR. SCHWEITZER:  Good morning, your Honor.

7       This is Aaron Schweitzer of Troy Law, PLLC for the

8       plaintiffs Nilda Suarez and Maria Calle.

9                    THE COURT:  I see your clients here and

10      there is a Spanish interpreter.

11                   Sir, I think you need to be sworn in as

12      interpreter.

13                   THE INTERPRETER:  Yes.

14                   (Interpreter is sworn.)

15                   THE COURT:  We have these microphones and

16      headsets.  This is the first time we're using them so

17      let's just do a test, okay?  All right, great.

18                   Sir, what is your name?

19                   THE INTERPRETER:  Alex Wieder, W-i-e-d-e-r.

20                   THE COURT:  Mr. Wieder, if you have trouble

21      hearing or being heard, let us know.

22                   Ms. Suarez Castaneda and Ms. Calle Alvarado,

23      please wave so we can fix the problem, okay?  All

24      right.

25                   Mr. Schweitzer, we're here for an inquest
```

1    and also a hearing on the motion for default judgment.

2    My first question just to deal with the default

3    judgment aspect is that I noticed for the affidavits of

4    service, the word "complaint" is crossed out and it

5    looks like only the summons was served.  Do you know

6    why that is?

7              MR. SCHWEITZER:  That is incorrect.  I

8    believe what the affidavits of service that you're

9    looking at, your Honor, show is that the word

10   "complaint" is crossed out but "amended complaint" is

11   inserted after.

12             THE COURT:  I see, okay.  So it is a

13   complaint.  It's just the amended complaint.  All

14   right, thank you.  I was concerned about that so thank

15   you for clarifying.  All right then, let's go right to

16   the inquest.  I've gotten some calculations and let me

17   try to understand how you reached those calculations

18   before we hear testimony on the specifics from your

19   clients, okay?

20             MR. SCHWEITZER:  Yes, your Honor.

21             THE COURT:  The print is very small so bear

22   with me.  My understanding is that Ms. Suarez Castaneda

23   worked from August 1st, 2016 to November 27, 2017.  She

24   did not have fixed hours.  She worked on specific jobs,

25   is that right?

1          MR. SCHWEITZER:  That is correct.  She

2    worked as a cleaning aide.  She would clean between two

3    and four rooms each day.

4          THE COURT:  Is this at one location or

5    several locations?

6          MR. SCHWEITZER:  Several locations.

7          THE COURT:  I see some -- excuse me.  I see

8    some hand gestures.  I don't know whether your clients

9    are having trouble hearing.

10          THE INTERPRETER:  I will sit next to them.

11          THE COURT:  Okay.  What's the problem, she

12    can't hear?

13          THE INTERPRETER:  They sometimes hear me,

14    sometimes they don't.

15          THE COURT:  I see, okay.  So much for

16    technology.  Why don't you go back to just having the

17    person?  You don't need to have those things in your

18    ears, just listen as Mr. Wieder speaks next to you,

19    okay?

20          So she worked at different locations.  So

21    you aggregated the week, the average she made per week

22    to get her hourly rate.  Is that how that worked?

23          MR. SCHWEITZER:  For the most part, yes.  We

24    averaged a weekly rate of $385.00.  However, for the

25    periods from -- the pay periods from October 23, 2017

1    through November 18, 2017, we had pay stubs, so we used

2    those numbers instead.  Those are for the period

3    October 23 to October 28, $455.00.  October 31 through

4    November 3, 2017, $350.00.  November 6 through November

5    11, $420.00, and November 13 through November 18,

6    $315.00.  Thereafter, we don't have any more pay stubs

7    so we went back to using the $385.00 average rate.

8                THE COURT:  I see.  So there are pay stubs

9    for four weeks?

10                MR. SCHWEITZER:  Yes.

11                THE COURT:  Okay.  And then you've

12   calculated out the Fair Labor Standards Act damages and

13   the New York Labor Law damages.  There is significant

14   overlap between the damages and plaintiffs don't double

15   collect, but I note that there's no unlawful tip

16   retention for the New York Labor Law and also, there's

17   no spread of hours on the FLSA.  Is that how it was

18   added up or did you simply add up the $13,000 and the

19   $10,000.  I believe the loss of the unlawful tip

20   retention in the New York Labor Law damage calculation

21   is a mistake.  That should be there.  There is

22   correctly no spread of hours under the FLSA.

23                THE COURT:  So then the amount we should be

24   using is the New York Labor Law because that's higher.

25                MR. SCHWEITZER:  Yes.

1          THE COURT:  Including the minimum wage.

2          MR. SCHWEITZER:  Once the unlawful tip

3   retention is added in.

4          THE COURT:  Okay.  So I'll just note that.

5   Then also for Ms. Suarez Castaneda, you've alleged sex

6   discrimination, harassment, and the damages you sought

7   there is $375,000.

8          MR. SCHWEITZER:  Yes.

9          THE COURT:  On what basis are you seeking

10  such a high amount, because you haven't submitted any

11  medical records or other damages.  You have

12  compensatory damages of $75,000 but you haven't told me

13  what they're based on, and then you have punitive

14  damages of $300,000.  Again, I don't have a sense of

15  how you've calculated that amount.  It strikes me that

16  this is garden variety emotional distress at most.

17         MR. SCHWEITZER:  That's correct, your Honor.

18         THE COURT:  So then we'll have to adjust

19  those numbers.  Is the allegation that she was

20  unlawfully terminated as a result of the

21  discrimination?

22         MR. SCHWEITZER:  The allegation is that she

23  was assigned to locations that were further away from

24  her starting location.  This allowed her less time to

25  complete her work, fewer rooms to complete per day.

1    Also, the emotional distress of the harassment itself.

2              THE COURT:  So are you seeking economic

3    damages?

4              MR. SCHWEITZER:  No, your Honor.

5              THE COURT:  So it's just pain and suffering.

6              MR. SCHWEITZER:  Yes.

7              THE COURT:  Let's turn now to Ms. Calle

8    Alvarado.  She worked from September 29th, 2016 to it

9    looks like here August 6th, 2018, is that right?

10             MR. SCHWEITZER:  That should be September

11   6th, 2017.

12             THE COURT:  September 6, 2017, but then

13   there's another one right under it with a 2018 date.

14   What is that?

15             MR. SCHWEITZER:  I don't see that from my

16   copy.  Let me take a look at what we submitted.

17             THE COURT:  This one is just for the pay

18   stub violation, it looks like, so I'm not sure why the

19   calculation is different from the time period that she

20   worked.

21             MR. SCHWEITZER:  We're looking at Maria

22   Calle, right?

23             THE COURT:  Yes.

24             MR. SCHWEITZER:  Maria Calle should be

25   September 29, 2016 through September 6, 2017.

1          THE COURT:  Okay.  Can you explain --

2    there's a box under that that has period, and those are

3    different dates.

4          MR. SCHWEITZER:  Oh, I see.  That is used to

5    calculate the prejudgment interest amount.

6          THE COURT:  Oh, I see.  Why are there two

7    different periods?  Why is it broken down?  Why is it

8    not just from the date she started work?

9          MR. SCHWEITZER:  Because it's -- the dates

10   in the lower period box are a mistake.  The starting

11   date should be the same starting date as the work

12   period.

13         THE COURT:  Yeah.

14         MR. SCHWEITZER:  So 9/29/2016.  On the first

15   line the second day, it should be the end date of the

16   work period, so 9/6/2017.  On the second line should be

17   the date after the work period ended, so 9/7/207, and

18   then the last date should be today's date.

19         THE COURT:  So I'll get rid of those dates

20   because that's not helpful.  So we'll just focus on the

21   first part, which is about the work period when your

22   clients worked.

23         MR. SCHWEITZER:  Yes.

24         THE COURT:  So why don't we get started with

25   their testimony.

1              MR. SCHWEITZER:  All right.

2              THE COURT:  So whoever you want to call

3    first.  It will be a little bit of a challenge because

4    the testifying plaintiff will need the interpreter.  I

5    suppose the interpreter will just say everything out

6    loud and then everybody can hear, right?  Okay.

7              Who is your first witness, Mr. Schwartz?

8              MR. SCHWEITZER:  Ms. Calle.  I'm starting

9    with her because she only has the one sort of claim.

10             THE COURT:  All right.

11             (Witness is sworn.)

12             THE CLERK:  Please state your name for the

13   record.

14             THE WITNESS:  Maria Calle.

15             THE CLERK:  Thank you.

16   DIRECT EXAMINATION

17   BY MR. SCHWEITZER:

18       Q.  Ms. Calle, are you familiar with F&R Cleaning

19   Services?

20       A.  Yes.

21       Q.  How are you familiar with F&R Cleaning?

22       A.  Because I worked with them.

23       Q.  As what?  What was your position?

24       A.  Housekeeping.

25       Q.  When did you start working in housekeeping for

1   F&R Cleaning?

2        A.   I started working there on September 29th,

3   2016.

4        Q.   When did you stop working for F&R Cleaning?

5        A.   September 6th of 2017.

6        Q.   What would you do as a housekeeping person for

7   F&R Cleaning?

8        A.   I cleaned apartments in different buildings.

9        Q.   How would you know which building you would be

10  cleaning in each day?

11       A.   Because the person in charge of giving me the

12  schedule for the day would give me the address so I

13  would be able to arrive there.

14       Q.   Who was the person in charge of giving you the

15  schedule each day?

16       A.   Jesus.  The last name, I don't -- I only

17  treated him like Jesus.  I called him Jesus.

18       Q.   Did you ever communicate with somebody called

19  Robert or Robert Melina?

20       A.   Yes.

21       Q.   Who is Robert Melina?

22       A.   The owner of the business, of the company.

23       Q.   How do you know that?

24       A.   Because Jesus told me.  He told us.  When he

25  hired me, he told me that he was the owner of the

1   company.

2        Q.  Can you describe your pay structure at F&R

3   Cleaning?

4        A.  $35.00 per apartment.  That was for regular

5   cleaning.  If it was a deep cleaning, like Jesus used

6   to tell us, it was $70.00.

7        Q.  About how many regular cleanings and about how

8   many deep cleanings would you do in a week?

9        A.  About six or seven regular cleanings and about

10  two deep cleanings.

11       Q.  How many rooms would you clean in a day,

12  typically?

13            THE COURT:  Do you mean apartments or rooms?

14  BY MR. SCHWEITZER:

15       Q.  Units, apartments.

16       A.  It depended, sometimes two, three and even

17  four.  It depended.  The numbers weren't always the

18  same.

19       Q.  How long would it take you from the time you

20  started your working day on a two-room day to the time

21  you finished your working day on a two-room day?

22       A.  I would start at 9:00 in the morning.  If it

23  was for a regular cleaning, I would finish in three

24  hours, three hours and a half.  If it was for a deep

25  cleaning of an apartment, it would be between four and

1    five hours, depending on how many apartments we would

2    get for that day.

3         Q.   To be clear, that's three hours per unit or

4    three hours per the day?

5         A.   No, three hours per unit, three hours per

6    apartment.

7         Q.   I see.  So on a two-unit day, you would work

8    about six hours, right?

9         A.   Yes.

10        Q.   Unless there was a deep cleaning, in which

11   case you would work longer.

12        A.   Exactly.

13        Q.   How about on a three-unit day?  How many hours

14   would you work?

15        A.   If I were to start work at 9:00 in the

16   morning, I would leave at 4:00 in the afternoon, 4:00

17   or 5:00.

18        Q.   And how about on a four-unit day?

19        A.   If they were regular, then I would end at 5:00

20   p.m., starting again at 9:00 in the morning.

21        Q.   I see.  Bearing in mind that each of your

22   working days was a different length because there were

23   different numbers of units you would have to clean,

24   about how many hours would you work in a given week, in

25   an average week?

1          A.   It's not really easy for me to tell because

2     they would vary and we would do the apartments that we

3     were told to do.  It varied a lot and I worked also on

4     Saturdays, so I can't really tell.

5          Q.   How many days did you work in a week?

6          A.   Six.

7          Q.   I see.  Were you ever paid overtime when your

8     work week exceeded forty hours?

9          A.   No, never.

10         Q.   Were you ever informed of what your pay rate

11    would be if it was calculated in hours or calculated as

12    an hourly rate rather than a per-unit rate?

13         A.   No, never.

14         Q.   Did you ever purchase cleaning supplies?

15         A.   Yes.

16         Q.   Did you use company or your personal money to

17    purchase those cleaning supplies?

18         A.   My own money.

19         Q.   Did the company ever reimburse you for that?

20         A.   A few times, not every time.

21         Q.   About how often would you purchase cleaning

22    supplies?

23         A.   Not always.  When they didn't have anything, I

24    would buy bleach, Clorox, or a Windex or Bounty that

25    was necessary.

Calle - Direct                                          14

1        Q.   About on average, how much money did you spend

2   each time you had to purchase cleaning supplies for the

3   company?

4        A.   I don't remember very well because it wasn't

5   all the time.  I did buy four or five times, $10.00

6   ever time.

7        Q.   Was there ever a time when your workday

8   exceeded ten hours?

9        A.   No.

10       Q.   Did your boss ever record the time that you

11  spent working?

12       A.   No, never.

13       Q.   When would you receive the instructions for

14  which rooms you would be cleaning?

15       A.   The night previous to the day where I was

16  supposed to work.

17       Q.   And that information would come from Jesus?

18       A.   Yes.

19       Q.   Was there ever a time when a customer would

20  cancel their cleaning?

21       A.   No -- oh, yes, many times.

22       Q.   When would you learn of the cancellation, when

23  and how?

24       A.   Many times, because Jesus would either send me

25  a text message or call me already when I was at the

1    building.

2         Q.   Were you compensated for the time you had

3    spent going to the building before you learned of the

4    cancellation?

5         A.   No, never.

6         Q.   How would you get to the cleaning site?

7         A.   By train.

8         Q.   Where would you be traveling from?

9         A.   I would come from Brooklyn.  Many times --

10   well, I would go from Brooklyn to Manhattan.  From

11   Brooklyn to Manhattan, those are the ways I would go

12   because that's where he had the buildings where we did

13   the cleaning.

14        Q.   Would you clean a single -- several rooms in a

15   single building each day or several rooms in several

16   buildings each day?

17             THE COURT:  Mr. Schweitzer, you keep calling

18   them rooms.  You mean units, apartments.

19             MR. SCHWEITZER:  Units, apartments.

20             THE COURT:  Okay.

21             THE WITNESS:  Several and very often, in

22   different buildings.

23   BY MR. SCHWEITZER:

24        Q.   How long would it take you to travel from

25   building to building each day?

1      A.   45 minutes, an hour.

2      Q.   Did you receive tips?

3      A.   Yes, but they were very far and few between,

4  not really significant.

5      Q.   When you're talking about receiving tips, did

6  you receive by cash or by credit card, or by both?

7      A.   No, only in cash.

8      Q.   Were there customers who did try to pay by

9  credit card -- excuse me, try to give tips by credit

10  card?

11      A.   I wouldn't know.  Perhaps at the time when

12  they would pay Robert or Jesus, they would give them

13  tips, but I don't know.

14      Q.   But you didn't receive any tips that were at

15  first paid by credit card, did you?

16      A.   No, never.

17      Q.   You mentioned that Jesus hired you, right?

18      A.   Yes.

19      Q.   At the time he hired you, did he give you a

20  piece of paper saying how much money you would be

21  making?

22      A.   No.

23      Q.   What about the hours you would work?  Did he

24  give you a piece of paper saying that?

25      A.   No.

1        Q.   When was your payday?

2        A.   There wasn't a specific payday but generally,

3    it was Thursdays, Thursdays, Fridays, and Tuesdays.

4        Q.   How would you receive your pay, by check or by

5    cash, or some other way?

6        A.   By check.

7        Q.   Where would you receive your check?

8        A.   The building that's on Broad Street, where

9    Jesus used work.

10             THE COURT:  I'm sorry, which street?

11             THE INTERPRETER:  Broad Street.

12             THE COURT:  Broad Street.

13   BY MR. SCHWEITZER:

14       Q.   Did you receive any other piece of paper with

15   your check?

16       A.   No.

17       Q.   Did you receive anything saying how many hours

18   you had worked in the period?

19       A.   No.

20       Q.   Were you paid for each week that you worked?

21       A.   Yes.

22       Q.   Were you paid for the periods between August

23   14 and September 6, 2017?

24       A.   No.  Those are the ones that they didn't pay.

25   Yeah, those were the ones that they didn't pay.

1      Q.   What happened after you didn't receive your

2  pay?

3      A.   I continued working, thinking that they would

4  pay, but yeah, they didn't pay and they didn't pay, and

5  that's how I left the job, because I didn't receive any

6  pay.

7      Q.   I see, thank you.

8           MR. SCHWEITZER:   I don't have anything more.

9           THE COURT:   I just have a few questions to

10 clarify.

11 CROSS-EXAMINATION

12 BY THE COURT:

13     Q.   So when Jesus told you the night before where

14 you were supposed to go, how did he communicate that,

15 by text, by email, by phone?

16     A.   Via text message.

17     Q.   Did you keep those?

18     A.   Yes, I have some messages from him.

19     Q.   Okay.

20          THE COURT:   Mr. Schweitzer, did you review

21 those text messages?

22          MR. SCHWEITZER:   I did.   I have copies of

23 those text messages.   I don't speak Spanish myself so

24 I'm going to be of limited use in walking your Honor

25 through them, but I can provide copies.

1          THE COURT:  I just wanted to know because

2   the work week was so variable, I just wanted to get a

3   sense if there's documentation of the work that she

4   did.

5          MR. SCHWEITZER:  There is.  There's about

6   forty pages of documents for her.

7          THE COURT:  All right, then I'll ask Ms.

8   Calle whether she reviewed them, okay?

9   BY THE COURT:

10      Q.  You testified earlier that you would normally

11  start work around 9:00?

12      A.  Yes.

13      Q.  Did you normally finish working at a

14  particular hour or was that always different?

15      A.  It was varied.

16      Q.  When would be the earliest you would finish?

17      A.  3:00 in the afternoon.

18      Q.  What was the latest?

19      A.  6:00 in the evening.

20      Q.  When you were -- I assume that when you worked

21  either from 9:00 to 3:00 or 9:00 to 6:00, you were

22  doing multiple apartments, right, not just one

23  apartment?

24      A.  Yes.

25      Q.  Was it your understanding when you were

1    getting paid that you would get paid for the time

2    between apartments or just the $35 for the apartment or

3    the $70 for the apartment?

4         A.   Only $35 and $70 per apartment.

5         Q.   Were there days when you didn't work?

6         A.   Yes, when they would cancel the apartments and

7    us.

8         Q.   Were there days when Jesus would call and say,

9    there's no work tomorrow?

10        A.   Yes, via text message he would send me, but it

11   was very rare.

12        Q.   You said you worked six days a week.  Was that

13   pretty regularly that you would work on Saturdays as

14   well or was it sometimes?

15        A.   No, every week.  Every week, I worked

16   Saturdays.

17        Q.   When you got paid, did you go over with --

18   Jesus was the one who paid you?

19        A.   Yes, he was the one who gave me the checks.

20        Q.   When you got the check, did you go over with

21   him how many units you cleaned to make sure that you

22   got paid for the work that you did?

23        A.   Yes.

24        Q.   Did he pay you properly up until those last

25   three weeks?

1       A.   Yes.

2       Q.   Did you ask him to pay you for the cleaning

3   supplies that you paid for?

4       A.   Yes.

5       Q.   What did he say?

6       A.   That it was all right.  He would pay me if he

7   had the money at that moment from the company.

8   Otherwise, he would tell me that Robert is going to pay

9   me by check.

10       Q.   Did Robert ever pay you by check?

11       A.   Yes, yes.

12       Q.   So did you get paid for all the cleaning

13   supplies that you did pay for?

14       A.   No, only two or three times.

15       Q.   Because earlier you said that there were about

16   four or five times that you paid for the cleanings and

17   it was about $10.00 each time.  Did you get paid for

18   some of those four or five times?

19       A.   Yes, two or three times.  I think they ended

20   up owing me one or two times because I don't remember

21   very well.

22       Q.   So they owe you $10.00 or $20.00.

23       A.   Yes, you could say that.

24       Q.   Okay.  Then I just want to understand from

25   August 14, 2017 to September 6, 2017, when you did not

1    get paid.  Did you keep track of the apartments that

2    you cleaned, the number of apartments that you cleaned?

3        A.  Yes, because since Jesus would send me the

4    text messages with the apartment numbers, I have them.

5    I have them written down in my calendar.

6        Q.  Did you calculate how much money they actually

7    owed you for those three weeks?

8        A.  Yes, yes, I did calculate.

9        Q.  Do you know how much it is or do you need to

10   look at anything to help you remember?

11       A.  $1,680.00.

12       Q.  Did Jesus or Robert promise to pay you for

13   your transportation costs?

14       A.  Never.

15       Q.  So you were supposed to pay for the subway

16   yourself.

17       A.  Yes.

18       Q.  Did you ever work longer than 9:00 to 6:00?

19       A.  No.

20           THE COURT:  Mr. Schweitzer, do you have any

21   followup questions?

22           MR. SCHWEITZER:  No.

23           THE COURT:  Thank you very much.

24           Your next witness?

25           MR. SCHWEITZER:  Nilda Suarez.

1          THE COURT:  Mr. Wieder, do you need a break

2   or anything?

3          THE INTERPRETER:  No.

4          THE COURT:  You're all right?

5          THE INTERPRETER:  Thank you.

6          THE COURT:  Sure.

7          (Witness is sworn.)

8          THE CLERK:  Please state your name for the

9   record.

10          THE WITNESS:  Nilda Suarez.

11          THE CLERK:  Thank you.

12   DIRECT EXAMINATION

13   BY MR. SCHWEITZER:

14      Q.  Ms. Suarez, are you familiar with F&R Cleaning

15   Services?

16      A.  Yes.

17      Q.  How so?

18      A.  Because I used to work there.

19      Q.  When did you start working there?

20      A.  Late August, 28th or 29th of August.  I don't

21   remember the exact date but I started on a weekend,

22   which was August 28th or 29th, until November.

23      Q.  Of what year?

24      A.  2016.

25      Q.  Did you work for F&R Cleaning after November,

1    2016?

2         A.   Yes.

3         Q.   From when to when?

4         A.   November.  I don't understand.

5         Q.   After November -- okay, let me back up.  After

6    November of 2016, did you stop working for F&R Cleaning

7    for a time?

8         A.   Yes.

9         Q.   Did you then start working for F&R Cleaning

10   again?

11        A.   Yes.

12        Q.   When did you start working for F&R Cleaning

13   again?

14        A.   In October, yes, October 26 of 2017.  Sorry,

15   23.

16        Q.   After October 23, 2017, did there come a time

17   when you stopped working for F&R Cleaning again?

18        A.   Yes.

19        Q.   When was that?

20        A.   It was in November, in the second week of

21   November or late November.  I stopped working because

22   they didn't pay me.

23        Q.   Did they not pay you for the whole period of

24   October to November, 2017 or did they not pay you for

25   some shorter period of time?

1       A.   They didn't pay me from the very first week.

2   The third week, they gave me a payment in cash.

3       Q.   Did you usually receive payment in cash?

4       A.   No.

5       Q.   How did you usually receive your payments?

6       A.   No, during that season that I worked, they

7   didn't pay me with statements, only in cash.

8       Q.   What was your job title and job duties at F&R

9   Cleaning?

10       A.   Housekeeping.

11       Q.   What did housekeeping involve?

12       A.   To clean the apartments, several apartments.

13       Q.   Was there a difference in your pay rate

14   between the first period that you worked and the second

15   period that you worked?

16       A.   Yes.

17       Q.   From now on, I'm going to be asking you about

18   the first period that you worked, that is from August

19   to November of 2016, all right?  What was your rate of

20   pay during that time?

21       A.   For simple apartments, for regular cleaning,

22   it was $35, and for deep cleaning, for a complete

23   cleaning of an apartment, it was $70.

24       Q.   During the first period that you worked, when

25   would you start your working day, what time?

1        A.   From 8:30 to 9:00.

2        Q.   When was the earliest that your work day would

3   end?

4        A.   2:00 or 3:00 in the afternoon.

5        Q.   When was the latest that your work day would

6   end?

7        A.   8:00 in the evening.

8        Q.   When would your work day most commonly end?

9        A.   3:00 or 4:00.

10       Q.   About how many regular cleanings and how many

11   deep cleanings would you perform in a typical week?

12       A.   It would depend on what he would send the

13   previous day, if it was two or three or if it was a

14   regular cleaning or deep cleaning.

15       Q.   By "he would send," you're referring to Jesus?

16   By "he would send," the "he" is Jesus?

17       A.   Yes.

18       Q.   How would Jesus give you your working

19   assignments?

20       A.   The previous day, he would send me by text

21   message.

22       Q.   Did you preserve any of these text messages?

23       A.   Yes.

24       Q.   Did you write down any of the -- any of your

25   work assignments?

1      A.   Yes, I had to write it down.  Sometimes I

2  would get confused because they would cancel the

3  apartments.

4      Q.   When you wrote down the apartments, would you

5  specify whether it was a regular cleaning or a deep

6  cleaning?

7      A.   Yes, I would write them down.

8      Q.   Would you write down how much money you

9  expected to receive based on whether it was a regular

10 or deep cleaning?

11     A.   Yes.

12     Q.   During this time, did you ever receive

13 overtime?

14     A.   No.

15     Q.   Refresh my memory.  You mentioned that the

16 latest you would work would be 8:00 in the evening

17 sometimes?

18     A.   There have been two or three occasions because

19 they gave me a large apartment, three bedrooms and

20 three bathrooms, and I started at 1:00 p.m. and I

21 wouldn't end.

22     Q.   I see.

23     A.   And it was too dirty.

24     Q.   And for those days when you worked late, up to

25 8:00, did you receive extra money for the time that you

1   worked?

2        A.   No.   I remember that day because the apartment

3   owner came.   He arrived at 7:00 and he had to wait, and

4   he gave me a tip.   It was the only owner who gave me a

5   tip.

6        Q.   And he gave you that tip in cash?

7        A.   Yes.

8        Q.   Would you ever receive tips by credit card?

9        A.   No.   On occasions, I have done apartments, two

10  or three apartments, but I only received tips from the

11  owners.

12       Q.   You never received credit card tips as part of

13  your paycheck?

14       A.   No.

15       Q.   I think I skipped ahead a little bit.   You

16  were paid by cash or by check?

17       A.   By check.

18       Q.   Where would you receive your check?

19       A.   In Water Street. I don't remember exactly the

20  address but that is the same address where my coworker

21  received the payments.

22       Q.   I see.   From whom would you receive your

23  checks?

24       A.   Jesus was the one in charge of giving out the

25  checks.

1      Q.  Were there weeks where you did not receive a

2  check but did work?

3      A.  Yes, yes.

4      Q.  To be clear, we're still talking about the

5  first period.

6            THE COURT:  Can we just talk about 2016 and

7  2017?

8            MR. SCHWEITZER:  Yes.

9            THE COURT:  That's clearer.

10           MR. SCHWEITZER:  That's what I've been

11  doing.  I'm just making sure that she's aware of that.

12           THE WITNESS:  Yes.

13 BY MR. SCHWEITZER:

14     Q.  For how many weeks in 2016 did you not receive

15  pay?

16     A.  Okay.  They would delay in giving me the

17  check.  When they stopped giving me work, they would

18  delay giving me the check.  They took about three or

19  four weeks to give me the check because I insisted that

20  I needed the check with my money.

21     Q.  When you stopped working in November, did your

22  boss still owe you any money at that time?

23           THE COURT:  In 2016.

24           MR. SCHWEITZER:  Yes, in 2016.

25           THE WITNESS:  Yes, he owed me for two or

1   three apartments that I did.  It was $200.00 and

2   change.

3        Q.  Did you ask -- withdrawn.  Did you ask anybody

4   to pay you that money?

5        A.  Yes, I told Jesus.  That's when he was late.

6   About the third or fourth week, that's when he gave me

7   the check.

8        Q.  Moving on to 2017.

9             THE COURT:  Before we leave -- so the money

10  that he owed you at the end of the 2016 period, he

11  eventually paid you, just three or four weeks late, is

12  that right?

13            THE WITNESS:  Yes.  I didn't have any other

14  problem until then, but there were some -- I didn't

15  have any other problem until then.

16            THE COURT:  All right, thank you.

17  BY MR. SCHWEITZER:

18       Q.  Now we're talking about the period from

19  October to November of 2017.  Claro?

20       A.  Yes.

21       Q.  What was your rate of pay during that period?

22       A.  He told me that it was $35.00 for the simple

23  apartments and 75 because they have increased by five

24  dollars the deep cleaning.

25       Q.  You say "he told you."  Are you referring to

1    Jesus?

2         A.   Yes, because he's the one who called me to

3    return to work.

4         Q.   When he called you to return to work, did he

5    go through the hiring process again or did he just call

6    you?

7         A.   No, he just called me and he told me that he

8    had everything because they had signed on and they

9    didn't have any problem.

10        Q.   When would you start work each day in this

11   period?

12        A.   He demanded that I be there at 8:30 or 8:00,

13   before 9:00, because by 9:00, I would have to already

14   be doing the apartments.

15        Q.   When was the earliest your work day would end

16   during this period?

17        A.   3:00, 4:00, 4:30 or 5:00, because they would

18   give me very dirty apartments.

19        Q.   When was the latest your work day would end

20   during this period?

21        A.   5:00 or 5:30 because I couldn't stay any

22   longer, because I have a daughter that I have to pick

23   up at school.

24        Q.   So between 3:00 and 3:30 and 5:00 and 5:30,

25   when was the usual time you would end your working day?

1        A.   3:30 to 4:00.  It was normally like that.

2        Q.   How many days would you work during this

3   period in a week?

4        A.   Saturdays and even Sundays.  Sometimes he

5   would tell me to go on Sundays.

6        Q.   Am I to understand that you worked six or

7   seven days a week or one or two days a week?

8        A.   No, it was -- if I had to, I would work seven

9   days because I needed it.  On Saturdays, he would send

10  me the four apartments for Sunday so I could finish

11  them.

12       Q.   I see.

13            THE COURT:  I'm sorry, I didn't understand

14  that.  So he would tell you Friday night that there

15  were -- what the four apartments were and then you

16  could do them Saturday.  And if you didn't finish, you

17  would work on Sunday to finish.  Is that what you mean?

18            THE WITNESS:  No.  Sometimes on Saturdays,

19  he would send me for the Sunday.  Well, those

20  apartments have to be cleaned by Monday no matter what.

21  So if they would send me somewhere else on Saturday, I

22  would have to go clean those on Sunday.

23            THE COURT:  So Sunday was more the exception

24  -- working on Sunday was more the exception than the

25  rule.

1          THE WITNESS:  No.  On Sundays, I could take

2    my daughter so I would do it more apiece.  But on

3    Saturdays, I could also take my daughter with me.

4    Saturdays he would send me one or two apartments.  But

5    when I went back to work the second time, he demanded

6    that I do the apartments on the Sunday.

7          THE COURT:  Okay, so did you work from 8:30

8    to 3:30 or 4:00 on Saturdays on a regular basis?

9          THE WITNESS:  No, I would start at 10:00 and

10   I would end by 1:00 or 2:00.  Sometimes I would do just

11   one.

12         THE COURT:  And then on Sunday?

13         THE WITNESS:  I would start at 11:00 and I

14   would finish at 7:00 or 8:00 because there were four

15   apartments.  I will have to bring over the things that

16   I needed, like the sheets, the laundry.  It wasn't far.

17   I would pick it up at Wall Street and take it there but

18   I had to take it with me.

19         THE COURT:  Why were you bringing it from

20   Wall Street?

21         THE WITNESS:  That's where the laundry was,

22   so I would have to bring the linens over there and then

23   bring them back, maybe because they didn't pay there.

24   I don't know.  I have no idea.

25         THE COURT:  Sorry for interrupting, Mr.

1    Schweitzer.

2              MR. SCHWEITZER:   That's all right.

3    BY MR. SCHWEITZER:

4         Q.   During the second period in 2017, did you

5    receive any overtime?

6         A.   No.

7         Q.   Did your bosses record your working hours?

8         A.   No.  I would have to tell him how much he owed

9    me because he didn't have any register or anything.  He

10   didn't keep track of it.  If anything, at some point,

11   he showed me a paper with a statement saying that I was

12   going to get paid.

13        Q.   Did you receive any piece of paper with your

14   paycheck each week?

15        A.   No, he -- no, I didn't receive any.

16        Q.   Did you receive an electronic -- I don't know

17   what you would call it -- receipt from the bank when

18   you deposited your checks?

19        A.   Yes, because I demanded that he pay me because

20   I didn't have any money to pay for fares or to buy

21   things.

22        Q.   When you say pay for fares or buy things, are

23   the things you're referring to cleaning supplies?

24        A.   Yes, that.

25        Q.   So at some point, you asked for money to pay

1    for fares and cleaning supplies?

2         A.  Yes.  He would ask me to pay things and then

3    when he would call me to tell me to go somewhere, he

4    would tell me, I have your payments here, and I would

5    ask him to show me.  This was Robert.  He would send

6    them to me and then I would go.

7         Q.  And you would go to Robert to pick up this

8    pay?

9         A.  Yes, he did because I went there.  He wouldn't

10   pay me and then I went there.  He had three apartments

11   for me and I told me that I couldn't go.  He said okay,

12   I'm going to make the deposit for you, and that's when

13   he gave me the deposit from the bank.

14        Q.  I see.

15             THE COURT:  When he gave the deposit from

16   the bank, that means he showed you that he deposited

17   the money into your bank account?

18             THE WITNESS:  Yes.  I asked him for all the

19   proof and yes, he gave me the deposit in my bank

20   account but with his company name.

21             THE COURT:  So it was a direct deposit into

22   your bank account?

23             THE WITNESS:  Yes.

24             THE COURT:  All right, thank you.

25             Mr. Schweitzer, those are the amounts that

1    are listed on the chart, those four amounts?

2            MR. SCHWEITZER:  Yes, beginning on October

3    23rd of 2017.

4            THE COURT:  Yes.

5    BY MR. SCHWEITZER:

6        Q.  Besides the payments that Robert made direct

7    deposit into your bank account, did you receive any

8    other pay stubs with your pay?

9        A.  I want to stress that he only paid me once

10   like that.  The other two times, he paid me in the

11   office but it wasn't a complete payment.

12       Q.  Okay.  When you were initially hired in August

13   of 2016, you mentioned that Jesus hired you, right?

14       A.  Yes.

15       Q.  Can you describe what the hiring process was

16   like at that time?

17       A.  It was through a friend who told me because

18   she knew that I was looking for work.  She told me to

19   go to Water Street.  I went there and he made me a

20   document -- he made me sign a document that had all the

21   law -- I don't know.  He made me sign a document and

22   that's how I did it.

23       Q.  That document that you signed, was it -- I'm

24   sorry.

25       A.  It was -- it asked for my full name, like when

1    you apply for a job, something like that.

2        Q.  Was this document in -- withdrawn.  Can you

3    read English?

4        A.  A little bit, not much.

5        Q.  Can you read Spanish?

6        A.  Yes.

7        Q.  Was the document that you signed with Jesus

8    Vazquez -- was that in English or Spanish?

9        A.  In Spanish.

10       Q.  Do you remember what it said?

11       A.  It was a simple sheet of paper only.  I

12   believe there were about two more in English and I took

13   pictures of them to read them later.  I don't remember

14   now.

15       Q.  Do you still have those pictures?

16       A.  I believe I don't but I had them translated

17   and they were normal for a job.

18       Q.  What does that mean?  What did the papers say?

19       A.  It was like the rules, the hours.  It was like

20   the rules that they were giving for the job, something

21   like that.

22       Q.  Did it say what your rate of pay would be?

23       A.  Yes, per apartment.  It was 35 for regular

24   cleaning and 70 for deep cleaning.

25       Q.  And this expressed as a per apartment rate

1    rather than an hourly rate?

2         A.   Right.

3         Q.   Were the hours you were expected to work

4    listed on this piece of paper?

5         A.   He would tell us that every apartment, every

6    single apartment would be two and a half hours, and

7    every apartment for deep cleaning would be three and a

8    half hours.

9         Q.   Did he tell you, either verbally or in

10   writing, the total number of hours you would be

11   expected to work in a week?

12        A.   That he would send me the number of

13   apartments.  Sometimes it would be one or two, it

14   depends.

15             MR. SCHWEITZER:  I believe that that's the

16   last I'm asking about the wage-and-hour matter.  So if

17   your Honor wants to ask questions about that before I

18   move on to the sexual harassment, or I can move on to

19   the sexual harassment and save all of your Honor's

20   questions for later, whichever.

21             THE COURT:  Let me just ask a few questions

22   about the wages.

23             MR. SCHWEITZER:  Okay.

24   CROSS-EXAMINATION

25   BY THE COURT:

1          Q.   In 2016, how much were you getting paid per

2     week?

3          A.   The first two months, I would paid 550 or 650

4     but the gross, it would be 500 or 600, and the discount

5     they would take out would be $100.00.

6          Q.   What were they taking $100.00 out for?

7          A.   Because I had dependents.  They always

8     discount when they pay me with that pay.  I don't know

9     what it's called, the paycheck.

10         Q.   So you did get a paycheck.  Did they show you

11    what those calculations were?

12         A.   Yes, but I never paid too much attention to

13    how they did the calculations.  I would always mind how

14    the total was, the salary, to match it up with my notes

15    that I had written down.  It was sometimes $10.00 less

16    or so but I didn't really pay much attention to that.

17    It was somewhat confusing because they were always like

18    $10.00 more or $10.00 less, how they calculated this,

19    and I couldn't understand it.  He would tell me, I'll

20    explain it to you, I'll explain it to you, and he never

21    did.

22         Q.   Were those also deposited into your bank

23    account or you were paid by check or by cash?

24         A.   By check.

25              THE COURT:  Mr. Schweitzer, in the chart, it

1    shows a weekly pay rate of $385.00 for 2016.  I don't

2    know where you get that number if she says she's

3    getting paid $500.00 or $600.00.

4              MR. SCHWEITZER:  I believe that $500.00 or

5    $600.00 is before withholding.

6              THE COURT:  I don't really know but she said

7    she'd only get about $100 taken out for that, so that

8    would still leave her getting paid -- it sounded like

9    she said she was getting paid $500.00 or $600.00, which

10   is still different from the $385.00 that you've put

11   here.

12             MR. SCHWEITZER:  Let me check really quick.

13   Because it varies between weeks how many rooms she

14   cleans, in a busy week, she would get a gross of

15   between 500 and 600 and then have 100 deducted from

16   that, so between 400 and 500.  On less busy weeks, she

17   would get between 400 and 500 and get 100 deducted or

18   rather withheld from that and end up with around 300.

19   So we averaged that and ended up with around 385.  It's

20   an approximation and we never pretended otherwise.

21             THE COURT:  Right, but it sounds like she

22   has actual numbers, you know?  She knew how much money

23   she was paid each week.  These are not long periods of

24   time.  I don't really understand why you're averaging

25   when you know exactly how much she was paid.

```
 1              MR. SCHWEITZER:  We don't know exactly how

 2  much she was paid.  From week to week, her pay would

 3  change.

 4              THE COURT:  I know but week to week, you

 5  know -- like you did here in these last four weeks.

 6              MR. SCHWEITZER:  For those, we have the

 7  actual --

 8              THE COURT:  Direct deposit.

 9              MR. SCHWEITZER:  Yes, we have the direct

10  deposits.

11              THE COURT:  But I heard her say she was also

12  getting paid -- there was documentation -- she got paid

13  by checks for the weeks in 2016.

14              MR. SCHWEITZER:  We don't have records for

15  those --

16              THE COURT:  Have a record for that?

17              MR. SCHWEITZER:  -- weeks in 2016.  We only

18  have records for the 2017.

19              THE COURT:  Let me ask Ms. Suarez.

20  BY THE COURT:

21     Q.  You said you were paid $500 or $600 a week.

22  Did you -- was that every week or were there some weeks

23  that were different?

24     A.  I said that that was during the first month,

25  that they paid me like that, because they would send me
```

1    to all the apartments.

2          Q.   Okay, and then after that?

3          A.   Then after that, they changed me because he

4    demanded that I would go and have coffee with him.  So

5    he would send me to other places like 33rd or he would

6    send me to Brooklyn.  They were less.

7          Q.   So after the first month, how much were you

8    getting paid per week?

9          A.   Well, it was 350, 380, 390, thereabouts.

10         Q.   All right, thank you.

11              THE COURT:  Go ahead, Mr. Schweitzer.

12              MR. SCHWEITZER:  All right.  The change, at

13   least in my view, relates to the sexual harassment that

14   began shortly after Ms. Suarez's hiring, so that's --

15              THE COURT:  The segue.

16              MR. SCHWEITZER:  That's what we're going to

17   be exploring now.

18   REDIRECT EXAMINATION

19   BY MR. SCHWEITZER:

20         Q.   Did you have an exchange with Jesus Vazquez

21   and his wife shortly after your hiring?

22         A.   First I had with the wife.  Together, no.

23         Q.   All right, so talk about the exchange you had

24   with the wife.

25         A.   That's when they were sending me -- that's

1   when they were telling me that it would be permanent,

2   to go for Sundays.  It was like to show me what -- how

3   the apartment was supposed to be left.  She was more

4   than anything questioning me, asking me questions about

5   my life.

6        Q.  What was she asking you about your life?

7        A.  If I was by myself, if I had a boyfriend,

8   where I lived.  She wanted to know like something about

9   me.

10       Q.  How did you respond?

11       A.  Yes, that I had a boyfriend.  And then she

12  asked me, where is that boyfriend?  Is it helping you?

13  What is he doing?

14       Q.  Did the exchange continue after that?

15       A.  Yes, and I have a boyfriend but that wasn't --

16  didn't have anything to do with him helping me

17  financially.  She would ask me if he called me, if he

18  didn't call me.  It was like interrogating me.  They

19  weren't normal questions for a job.  I tried to change

20  the subject, tried to ask her about the job and other

21  things.  At the time, I didn't know that she was Jesus'

22  wife.  Then about two weeks later, I found out that she

23  is Jesus' wife.  I found out from a coworker who

24  brought me here, Celia.

25       Q.  How did the exchange with Jesus' wife end?

1        A.   It was left at that but I was left under the

2   impression that it had something to do with Jesus

3   because she was drilling me with these questions.  She

4   was going really in-depth.  She was asking me, who

5   brought you, when did you start, how do you know -- I

6   felt like it had to do with Jesus.

7        Q.   Did Jesus contact you thereafter?

8        A.   Then at night, since he always sends the

9   messages at 5:00 or 6:00 p.m. for the next day, he sent

10  me the message and he wrote, so you have a boyfriend.

11  I wrote yes, what is the problem?  He wrote back, none.

12  On the day he sent me only one apartment for the next

13  day and then the following day, he didn't send me any

14  apartments.  The next day I asked him if there were any

15  apartments to do.  He said yes, yes, and he sent me one

16  for the next day but he didn't do it until late in the

17  morning.

18       Q.   Did anything else about how he assigned you

19  apartments change at that time?

20       A.   Yeah, he sent me to one, then he didn't.  Then

21  I would contact him and he would ask me -- he sent me

22  to an apartment and he asked me to send him a picture

23  of me.  I sent him a normal picture and then he wrote

24  back that he wanted something sexier and I didn't

25  respond to him.  Then he didn't send me to any more

1    apartments.  Then I asked him about work and he

2    responded, but you didn't send me a sexier picture.  He

3    was like that, insistent.

4         Q.  When did this exchange regarding the picture

5    take place?

6         A.  In 2016.  I don't remember exactly when it was

7    but it was -- yeah, it was during the first month when

8    I started, in the first month.

9         Q.  Did Jesus ever ask to visit you at your home?

10        A.  Yes, because I asked for permission because I

11   was going to move.  I asked him for permission for one

12   day because I needed to move.  He asked me, oh, yes,

13   and are you going to invite me to your house.  Yeah,

14   that was it.  And I wrote to him, I can't invite you to

15   my house because I live in a room and I live with my

16   daughter, and it would be inappropriate to invite you.

17   For what intention would I be inviting you to my room?

18   Yes, I told him that it was a decent family house and

19   it belonged to a couple, and I would have to get

20   permission to get visits from them.  If he wanted to

21   visit me, since he was insisting so much, it would be

22   up to the kitchen because he wouldn't be allowed to go

23   any further.  I was doing this to distract him because

24   he was really smothering me by now.

25        Q.  After this exchange, did the way he assigned

Suarez - Redirect                          46

1  you apartments change or did the quality of the

2  apartments change?

3       A.  Yes, I felt that he did because he would send

4  me to different apartments.  He would send me to 33rd

5  Street and from there, I would have to go to Brooklyn

6  and that required me to take double transportation.  It

7  would make things very complicated for me because I had

8  to pick up my daughter.  I felt -- maybe it was my

9  imagination but I felt that he was putting pressure on

10 me.

11      Q.  You mentioned earlier in your testimony that

12 you were -- that after a certain point, you were

13 assigned especially dirty apartments.  Did that have

14 anything to do with this?

15      A.  Yes.  In the beginning, I was where he was and

16 his wife in Wall Street and she would show me.  Then I

17 heard that she became jealous, so he had to assign me

18 to other apartments in different places.  Then he

19 started assigning me to really dirty apartments.

20      Q.  What was the reason you left F&R Cleaning in

21 November of 2016?

22      A.  He gave me less and less apartments and that's

23 because he stopped calling me.  He started giving me

24 less and less apartments, until there were no

25 apartments anymore.  I would call him and he would just

Suarez - Redirect                          47

1    say that there is no more work, there is no work.  Then

2    one day out of the blue, he called me asked me if I

3    could go to an apartment, but it was very late and I

4    didn't go.  He didn't give me work.  He wouldn't call

5    me and I would call him and he would say, there's no

6    work, there's no work.  But it was a lie because I

7    would call my coworker Maria and the other lady, Celia,

8    and they would say that that's not true because they

9    gave me two apartments.

10        Q.  Maria is Maria Calle, who is here?

11        A.  Yes.

12        Q.  And Celia is the one who introduced you to the

13   job?

14        A.  Yes.

15        Q.  Did you tell Maria or Celia about the

16   inappropriate messages you were receiving from Jesus?

17        A.  Yes.  Furthermore, I sent Celia pictures of

18   the first things that he wrote to me.  She said, the

19   gall he has.

20        Q.  Gall?

21        A.  Yes.  Also, Maria said the same.  By gall I

22   mean saying the things that he was saying to me.

23        Q.  I see.  I just didn't hear properly.  Do you

24   have copies of the texts that were exchanged between

25   you and Jesus?

1          A.   The first ones, no.   The ones from 2016, I

2    don't have them because my phone got damaged, actually

3    at work, and I had to reset the phone, so I only have

4    some.   But 2017, I do have them but they were less.

5          Q.   I see.   Did you ever complain about Jesus'

6    conduct to Robert?

7          A.   No, because I was afraid that he would tell

8    Robert that she comes to work late, that she has

9    problems with her daughter, and I didn't want that.

10   But I also didn't give it so much importance.   Also,

11   Robert was barely there.   He didn't go much to the

12   office.

13         Q.   Jesus was there all the time?

14         A.   Yes, he works daily.

15              MR. SCHWEITZER:   I have nothing more.

16   RECROSS-EXAMINATION

17   BY THE COURT:

18         Q.   So the things you described about Jesus and

19   the text messages happened in 2016, right?

20         A.   '16, yes, and also in 2017.   I have also proof

21   of the messages he sent me.

22         Q.   So you didn't work between December of 2016

23   and early October, 2017.   That's about a year when you

24   didn't work for F&R Cleaning, right?

25         A.   Yes.

1      Q.   Were you working for someone else or was it

2   the time when Jesus was saying there was no work for

3   you?

4      A.   Yes, I started studying to become a home

5   attendant.   I studied to become a home attendant and I

6   was working as a home attendant.

7      Q.   What made you go back to working for F&R?

8      A.   Because as a home attendant, they would only

9   give me four hours, and I figured that I would be able

10  to juggle and work as before, and work for the agency

11  again.

12     Q.   Did you formally stop working for F&R Cleaning

13  in 2016.  Did you say, I don't want to work, or you

14  just never got any more work in 2016?

15     A.   No, it was simply -- he didn't say absolutely

16  anything to me.  Further, I wrote to him that he should

17  have been more gentlemanly and just as he let me know

18  about work, he should have let me know that I'm not

19  going to be working more with you.

20     Q.   It looked like the last two weeks you worked

21  in 2016, you didn't get paid, or you did get paid?

22     A.   Yes, they did eventually but I insisted and

23  insisted and they wouldn't pay me.  I went there on

24  three or four occasions and he would say, Robert didn't

25  send me the check, Robert didn't give me the check.

1   Then one day, I said, okay, I'm going to come to pick

2   up my check, and then it was there.  I also went -- I

3   believe this was in January because I had to also go to

4   pick up for the income tax, that receipt that you use

5   to do your income tax.  I picked up both because I

6   demanded them.

7        Q.  So in 2017, you went back to work.  Did things

8   change with Jesus or he acted the same way?

9        A.  No, in the beginning, it wasn't.  I returned

10  and I asked if it's going to be the same.  He said yes,

11  just work, and he told me that he would send me the

12  apartments later.  He did and that was it.  That was

13  the first week.  Then the second week, he told me that

14  he wanted me to introduce him to some friends of mine,

15  some friends who were to be single or single mothers

16  because he didn't want anybody with any commitments.

17  It's a problem to have women with commitments, he told

18  me.

19        Q.  To work for F&R?

20        A.  The second one was in 2017.

21        Q.  He wanted you to introduce him to people to

22  work for him.

23        A.  Like to work and also to go out with him.

24  That's what he wrote to me.

25        Q.  So the single wasn't just about having no

1  commitments to work, the single was available to date

2  him.

3       A.   That's right.

4       Q.   Did you say no?

5       A.   I told him that I have young friends but that

6  they would not go out with married men.  In other

7  words, I was following along to see but I did tell him

8  that my friends would not go out with a married man.

9  He left it at that and then he said that from now on,

10  Robert would paying me.  I asked him, what about you,

11  and he said no, the checks now would come only from

12  Robert.  I told him, but you're the one who called me

13  to work.

14       Q.   Can you tell me what effect Jesus' conduct had

15  on you?

16       A.   I felt like uncomfortable because, okay, if

17  she's not paying attention to me, then I'm not going to

18  tell her.  I felt uncomfortable because I was asking to

19  be paid and now he was sending me over to Robert, which

20  was worse.  It was something like, you know, if she

21  doesn't want to go out with me, I'm not going to help

22  her out.

23       Q.   What was the effect of Jesus asking you out

24  and things like that in 2016?  I understand you said

25  that after you said no, he sent you to fewer apartments

1   and dirty apartments.  But aside from that, did that

2   have any effect on you?

3        A.  Yes, because I'm not accustomed to that and I

4   felt like with those messages and him sending me to

5   less and less apartments, he was kind of forcing me to

6   go out with him, and that made me feel uncomfortable.

7   It felt uncomfortable, kind of like being forced to go

8   out with him.  I did feel uncomfortable because I did

9   need the work because I needed the money at the time.

10       Q.  Do you think it affects you today?

11       A.  No, because I know that I'm not supposed to

12  mix one thing with the other.  As a mature person, I

13  know what I have to do.

14       Q.  Thank you very much.

15            THE COURT:  Any followup?

16            MR. SCHWEITZER:  No.

17            THE COURT:  All right, thanks.

18            Mr. Schweitzer, I realize we didn't have any

19  testimony from Ms. Calle about the amount she was paid.

20  Do we have that on the record?  You've estimated also

21  $385 a week as far as what she was paid.  I don't

22  recall her saying anything about that.

23            MR. SCHWEITZER:  Yes, I had asked her about

24  that and she said that it varied from week to week,

25  that she wasn't able to give a definitive answer for an

1  average.  So the average that we arrived at was derived

2  from the number of rooms that she cleaned.

3           THE COURT:  Okay.

4           MR. SCHWEITZER:  -- at the $35.00 rate and

5  the number of rooms that she cleaned at the $70.00

6  rate.  Averaged per week, that's approximately seven by

7  35 and two by 70.

8           THE COURT:  Right, because the number of

9  hours she worked -- she said that she worked -- she

10 cleaned maybe six or seven regular apartments and two

11 deep cleaning per week.

12          MR. SCHWEITZER:  Yes.

13          THE COURT:  So based on that, it looked --

14 so you calculated the pay based on that.

15          MR. SCHWEITZER:  Yes.

16          THE COURT:  Okay.

17          MR. SCHWEITZER:  We calculated seven by 35

18 and then two by 70.  That ends up being 385.

19          THE COURT:  Got it, okay, I understand.

20          Thank you for presenting the testimony.  I

21 didn't hear anything as far as Frantz Scutt.

22          MR. SCHWEITZER:  Frantz Scutt did not

23 interact with the employees but he is the registered

24 agent for service of process at the corporate address.

25          THE COURT:  All right, so why is he

1  personally liable?

2         MR. SCHWEITZER:  He's personally liable

3  because he -- because Jesus is not present at the

4  central office, Robert is not present at the central

5  office, but he is.  Jesus is in a field office,

6  typically.  Robert is running another business most of

7  the time.

8         THE COURT:  Right, but just because somebody

9  is sitting in the office and is the registered agent

10  for service, why is that person liable as an employer?

11  Because an employer under the law has to have control

12  over the working conditions or the pay.

13         MR. SCHWEITZER:  I see.  The person at the

14  central office would be the person who is doing the

15  payroll usually.  This is not a business that pays its

16  employees in cash, this is a business that does check

17  payroll.  They need somebody to do that.  It wasn't

18  Jesus, it wasn't Robert.  As far as we've been able to

19  ascertain, it was Frantz Scutt.  I realize the record

20  is somewhat sparse with regard to him but --

21         THE COURT:  Right.  I'm just looking at this

22  amended complaint because in a default, I deem the

23  facts to be true.  Here you've alleged that he is in

24  charge, including hiring and termination, so that's

25  fine.  You've alleged it and I can accept that as true.

1          So let's go back to your calculations.  It

2     seems to me that for Ms. Suarez, you have -- the very

3     last line looks like a cumulative number.  You said

4     five weeks and you said she didn't get paid, but those

5     are the -- those are weeks that are encompassed in the

6     weeks where she has payment just above that.  Do you

7     see what I'm saying?

8               MR. SCHWEITZER:  Yes.

9               THE COURT:  So that's a double counting.

10              MR. SCHWEITZER:  Yes.  That should not be

11    there.  Those weeks were for weeks that she got paid

12    late but she did get paid for them.  That should not be

13    there.

14              THE COURT:  Right.  There are two -- line 2

15    of your spreadsheet are the two weeks in 2016 when she

16    didn't get paid on time but she did get paid, so I

17    appreciate that that number goes away.  But then the

18    very last line shows the work period from October 23rd

19    through --

20              MR. SCHWEITZER:  Through November 27, which

21    is --

22              THE COURT:  November 27, 2017, right.

23              MR. SCHWEITZER:  Yes, and that --

24              THE COURT:  That's cumulative.

25              MR. SCHWEITZER:  That should not be there.

```
 1              THE COURT:  Okay.  Then the spread of hours
 2   might be applicable on the days that she worked until
 3   8:00 but that doesn't sound --
 4              MR. SCHWEITZER:  Yes.  We don't have records
 5   of when she worked.
 6              THE COURT:  Right.  It doesn't sound like
 7   that was on a regular basis.
 8              MR. SCHWEITZER:  No, that would be on a
 9   somewhat exceptional basis.  The spread of hours
10   calculation assumes for the first period seven days in
11   the week and then thereafter six.
12              THE COURT:  Okay.
13              MR. SCHWEITZER:  That's a little much.
14              THE COURT:  Then for Ms. Calle, it doesn't
15   sound like she has any spread of hours because she said
16   the latest she worked was until 6:00.  That's nine
17   hours, 9:00 until 6:00.
18              MR. SCHWEITZER:  Yes, that's right.
19              THE COURT:  Then as far as the unlawful tip
20   retention, it sounds -- do you have any evidence that
21   tips were being put on the credit cards that are paid
22   to the company?
23              MR. SCHWEITZER:  No.
24              THE COURT:  So how do we know that tips were
25   being retained?
```

1          MR. SCHWEITZER:  We only have -- we have in

2   the complaint that approximately 60% of people would

3   pay by credit card, and we have both in the complaint

4   and in the testimony that the employees never saw those

5   tips.

6          THE COURT:  Right, but my understanding of

7   how these cleaning companies work is that people pay

8   the cleaning company, not the cleaner directly.

9          MR. SCHWEITZER:  Yes, but --

10          THE COURT:  So the bill, so to speak, is

11   through a credit card.

12          MR. SCHWEITZER:  But even a credit card tip

13   given to the company is still supposed to be then

14   remunerated to the employee.

15          THE COURT:  I'm just trying to figure out

16   whether people in fact do pay a credit card tip because

17   it sounded like on occasion, your clients did get paid

18   cash tips.

19          MR. SCHWEITZER:  On occasion, they did, yes.

20          THE COURT:  Right.  So how do you know that

21   anyone is ever paying card tip?  Is there a line for

22   tips on the credit card bill?

23          MR. SCHWEITZER:  I don't believe we have the

24   credit card bills that were given to customers.  No, we

25   don't.

1          THE COURT:  Because it could be that

2    customers think that everything is included and if they

3    wanted to give a tip, they should leave cash in the

4    apartment or give it to the cleaner personally.  I'm

5    just not sure how we know that tip is ever being given

6    to the company.  Do you have any support or way for the

7    Court to infer that there are tips being given?  I

8    understand in restaurants for example there might be a

9    line for the tip and you can include it there.

10          MR. SCHWEITZER:  I understand the point and

11    apart from the allegations in the complaint, no, I

12    don't have anything.

13          THE COURT:  Right.  So that's going to be

14    hard for me -- again, I can accept that the allegations

15    are true but for the inquest in terms of the amount of

16    damages, I can't -- I have no way of calculating how

17    much tip was withheld, so that's going to be a hard one

18    for me to find.

19          Then for the out-of-pocket costs, it sounded

20    like Ms. Calle said she's owed about $10.00 or $20.00

21    for the cleaning.

22          MR. SCHWEITZER:  Yes, that should be de

23    minimis.

24          THE COURT:  Right.  And then for Ms. Suarez,

25    she didn't say how much that was.

1          MR. SCHWEITZER:  For Ms. Suarez, we actually

2    have receipts from a couple of times she claimed --

3          THE COURT:  Receipts as far as the cleaning

4    supplies?

5          MR. SCHWEITZER:  Yes.

6          THE COURT:  But she said she was reimbursed

7    for most of those, right?

8          MR. SCHWEITZER:  Yes, she did.  They run

9    between $18.00 and $10.00.  It's not very much for her,

10   either.

11         THE COURT:  We didn't ask her how much she

12   felt she was owed at the end of the day on that.

13         MR. SCHWEITZER:  No.  From what I see, at

14   most, it would be something like $60.00, but it seems

15   that she was reimbursed for that.

16         THE COURT:  I don't know that I have any

17   support for recovery on the cleaning costs for her.

18   And then as far as the transportation costs, how are

19   you calculating that they're owed money for that?  Is

20   there a law that says that they have to be paid for

21   transportation?

22         MR. SCHWEITZER:  Going between job site and

23   job site, yes, they would be.  That's still working

24   time.  But going between home and the job site, no,

25   that would not be compensable.

1          THE COURT:  Right, working time, but you've

2    got here transportation costs.  I don't believe the law

3    requires that the cost of a subway fare between jobs is

4    required, right?

5          MR. SCHWEITZER:  The cost of the fare

6    itself?  The question is whether we can nail down the

7    amount of time spent.

8          THE COURT:  The amount of time is easier

9    because if they start at 9:00 and they end at 4:00,

10   assume that's all working time, even if some of it's

11   transportation, so that's how we're doing the

12   calculation.

13         MR. SCHWEITZER:  Okay.

14         THE COURT:  But you've put here as a

15   separate item transportation costs, so I'm just trying

16   to figure out what the basis is to say that they should

17   be reimbursed for the subway fare.

18         MR. SCHWEITZER:  I see what you're looking

19   at.  That's not an item that goes into the calculation,

20   that's a note.

21         THE COURT:  Okay.  Because you said breach

22   of contract but I don't know that there's evidence of a

23   contract because it sounded from your clients like they

24   said that they were expected to pay their own

25   transportation.  They weren't told that they would be

1    reimbursed so there's no contract that was breached.

2                    MR. SCHWEITZER:  Yes.

3                    THE COURT:  Okay.  I think that covers the

4    questions I have.  Then as far as the sexual

5    harassment, again, I assume the facts to be true, so

6    the conduct does look like it's discriminatory and

7    harassing.  You're saying that the adverse employment

8    action is that she got less work and therefore got paid

9    less.

10                   MR. SCHWEITZER:  Yes, because if you get

11   paid on a piece rate and you get fewer pieces assigned,

12   then --

13                   THE COURT:  Right.  So are you saying that

14   she should get paid the difference between what she was

15   getting paid and then what she later got paid?

16                   MR. SCHWEITZER:  Yes, because what she got

17   during the --

18                   THE COURT:  During the one month.

19                   MR. SCHWEITZER:  -- first month, before

20   being asked to date Mr. Vazquez, that was substantially

21   more than what she was getting thereafter.

22                   THE COURT:  She said it was $500 or $600 and

23   then later, it was about $300.

24                   MR. SCHWEITZER:  Yes.

25                   THE COURT:  So that's part of the economic

1   damages there.

2           MR. SCHWEITZER:  Yes.

3           THE COURT:  But as far as her emotional

4   distress, I did not really hear much about that.

5           MR. SCHWEITZER:  You heard that during the

6   employment --

7           THE COURT:  Uncomfortable.

8           MR. SCHWEITZER:  -- she was being made

9   uncomfortable.

10          THE COURT:  Right.

11          MR. SCHWEITZER:  Thereafter, it would seem

12  the emotional distress stopped with the job.

13          THE COURT:  Right.  And in fact, she went

14  back.

15          MR. SCHWEITZER:  She went back for a month

16  to try to cover -- try and make up for not being able

17  to work very much at her --

18          THE COURT:  I appreciate her economic

19  reasons for going back.  I'm trying to figure out --

20  there are cases where there's trauma and things like

21  that.  It doesn't sound like that's what happened here.

22          MR. SCHWEITZER:  I see.

23          THE COURT:  Unless I'm missing something,

24  but that's what I heard.

25          MR. SCHWEITZER:  Well, she also dealt more

1    with Robert during the second period and not with

2    Jesus.

3              THE COURT:  But that's not really -- there's

4    no evidence that that's an adverse employment action

5    because we don't know that Robert was any worse than

6    Jesus.  It actually sounds like maybe that was an

7    improvement because Jesus was acting so badly.

8              MR. SCHWEITZER:  The problem with Robert is

9    that he's less involved in the business.  So when

10   there's a pay dispute, for example, he's more difficult

11   to get a hold of.  You have to wait longer to get your

12   pay or to get reimbursed for your --

13             THE COURT:  That's not an adverse employment

14   action really, right?

15             MR. SCHWEITZER:  If you're living paycheck

16   to paycheck, it can be.

17             THE COURT:  Well, under the law -- in fact,

18   that hasn't been pled as an adverse employment action.

19             MR. SCHWEITZER:  Okay.

20             THE COURT:  That she had to deal with

21   Robert.  And under the analysis that I would have to do

22   for the extent of damages for emotional distress, it

23   sounds like it's fairly minimal.

24             MR. SCHWEITZER:  I see.

25             THE COURT:  It may not be zero but it's

1    fairly minimal.

2           I'll have to go through the attorneys' fees

3    in greater detail to see what that is.  It seems like a

4    lot of hours you've billed and it may be that I need to

5    cut those down.  Let me check with my clerk.

6           MR. SCHWEITZER:  I'm being told that in

7    fact, Nilda Suarez was not reimbursed for her supplies.

8           THE COURT:  If you could just have her come

9    back (ui).

10          MR. SCHWEITZER:  Yes, please.  Go back to

11   the stand.  We just need to get this on the record.

12          THE COURT:  Ms. Suarez, I'll remind you that

13   you're still under oath.  So the question was whether

14   you -- when you paid for cleaning supplies out of your

15   own pocket, whether you ever got reimbursed for it.

16          THE WITNESS:  None, no.

17          THE COURT:  So in your estimation, how much

18   money are you owed for that?

19          THE WITNESS:  Maybe $80.00 or something more

20   because I don't have all the receipts.  I have the

21   receipts that I have shown.

22          MR. SCHWEITZER:  When you refer to receipts

23   that you've shown, you're referring to receipts from

24   November 27?

25          THE WITNESS:  Yes.

1              MR. SCHWEITZER:  That is one receipt for

2    $16.89?

3              THE WITNESS:  They are small receipts.

4              MR. SCHWEITZER:  Hmm?

5              THE WITNESS:  They are small receipts.

6              MR. SCHWEITZER:  Yes.  That's one receipt

7    for $16.89, one receipt for $17.10.  These are before

8    tax totals.  One for $9.67, one for $14.82?

9              THE WITNESS:  Yes.

10             MR. SCHWEITZER:  Okay.

11             THE COURT:  What are the dates on those?

12             MR. SCHWEITZER:  That is November 27 of

13   2017.

14             THE WITNESS:  But those are the only ones.

15   I had from 2016 but they never gave the receipts to me.

16   Yes, and I insisted to Robert because those were for my

17   fares.  He said that he would include them in my check

18   but I never received the payments.

19             THE COURT:  When you say fares, you mean the

20   subway?

21             THE WITNESS:  Yes, of course, because I was

22   going from one place to the next and I would -- I had

23   to take the money from there.  He said that he would

24   reimburse that to me.  There was one day in which there

25   were three statements.  One was the highest, for $23.00

1    and change, but he never paid them to me for the

2    supplies.

3                    THE COURT:  So were the dollar amounts that

4    Mr. Schweitzer just read just for supplies or supplies

5    plus subway fare?

6                    THE WITNESS:  No, only for cleaning

7    supplies.

8                    THE COURT:  And the fares are something

9    separate.

10                   THE WITNESS:  No, I would ask him to give me

11   that money back for me to pay for my fares because it

12   was from my money that I would pay that.

13                   THE COURT:  Let me ask you, Mr. Schweitzer.

14                   MR. SCHWEITZER:  Sure.

15                   THE COURT:  The receipts that you just read

16   are for cleaning supplies.

17                   MR. SCHWEITZER:  Yes, each one is for

18   cleaning supplies.  Two were from 53 Mini-mall, one

19   from ABC Superstore and one from, I can't read it, it's

20   illegible.

21                   THE COURT:  Can you just submit a copy of

22   that in evidence?

23                   MR. SCHWEITZER:  Yes, I can.

24                   THE COURT:  This discussion about the fares,

25   we don't have any documentation of that.

1              MR. SCHWEITZER:  No, we do not.

2              THE COURT:  In addition to what Mr.

3    Schweitzer just read, those four receipts, were there

4    other cleaning supplies that you paid for that they

5    didn't reimburse you?

6              THE WITNESS:  Yes, there are several, like a

7    mop and a broom, several other things.

8              THE COURT:  I'm just going to give this to

9    the witness as Plaintiff's Exhibit 1.  Mr. Schweitzer,

10   do you want to admit this?

11             MR. SCHWEITZER:  Yes, please.

12             THE COURT:  You'll need to ask the witness

13   about the document.  Does she recognize it?

14             MR. SCHWEITZER:  May I approach?

15             THE COURT:  Yes.

16             MR. SCHWEITZER:  Do you recognize this

17   document?

18             THE WITNESS:  Yes.

19             MR. SCHWEITZER:  Can you describe it?

20             THE WITNESS:  These are the receipts from

21   the purchases that I did before going to work, because

22   he would call me and he would say that there was

23   nothing there so asked me to buy them.  He would say,

24   buy them and I will reimburse them in your check.

25   These are the only ones that I have with me because the

1   other ones, which were for more, I gave them to him and

2   they were higher.  These are Mini-mall.  The other ones

3   are higher because I bought a mop and the things for

4   the mop and that sort of thing.

5           MR. SCHWEITZER:  This looks to be a picture

6   of a cell phone screen.  Is this something you took a

7   picture of and texted to Robert?

8           THE WITNESS:  Yes, I sent it to him.  He

9   knows that these other ones that I paid, and the other

10  ones which he never paid back to me.

11          MR. SCHWEITZER:  Thank you.

12          THE COURT:  Are you going to admit this?

13          MR. SCHWEITZER:  At this time, I would like

14  to admit Plaintiff's Exhibit 1.

15          THE COURT:  Plaintiff's Exhibit 1 is in

16  evidence.  Thank you.

17          (Plaintiff's Exhibit 1 Received.)

18          THE COURT:  Can you estimate how much more

19  money you paid in cleaning supplies that you don't have

20  the receipt for?

21          THE WITNESS:  I believe that it would be $80

22  or $100 but exactly, I would not be able to estimate

23  them because I gave him the checks -- is that what

24  they're called -- and he kept them.  He never gave them

25  back to me.

1          THE COURT:  That's fine.  I understand you

2    don't have it.  I just was asking for an estimate.

3    Thank you.  That's all.

4          Mr. Schweitzer, the inquest would not have

5    been so long if whoever prepared these calculations

6    were more accurate.  I don't know if you were the one

7    responsible but I feel the need to mention it because

8    it has been extremely frustrating to go through so much

9    detail with your witnesses, and they've done their best

10   in terms of remembering things.  But it strikes me that

11   whoever prepared these documents did not have their

12   full information before preparing it and did not give a

13   thoughtful analysis in terms of the tip and the spread

14   of hours and the missing wages and all those other

15   things.  I would like to make sure that you bring that

16   message back to your office, that in the future, I

17   expect better, all right?

18          MR. SCHWEITZER:  Yes, your Honor.

19          THE COURT:  Because if these documents are

20   based on your firm's detailed discussion with your

21   clients, then the Court wouldn't have to go through

22   those discussions with your clients here under oath.

23   We spent two and a half hours on this, in excruciating

24   detail.  Like I said, your witnesses have done their

25   best, but it strikes me that they weren't adequately

1  interviewed before today.  So for future cases, because

2  I know your firm has a lot of these cases, I'm going to

3  be looking for a higher -- a better work product.  It

4  may be that as a result of today, that in the future,

5  that I will have bifurcated inquests, where I talk to

6  the attorney first to understand what's going on, and

7  then have the witnesses come in so that they don't have

8  to sit here for half a day on these details.  I think I

9  have all the information I need and I'll be issuing my

10  decision shortly.

11          Let me find out from you -- I should have

12  asked this at the beginning.  Did someone from your

13  firm notify the defendants of today's inquest?

14          MR. SCHWEITZER:  Yes.

15          THE COURT:  Okay.

16          MR. SCHWEITZER:  The notice is in the

17  record, first of our filing of the motion and then of

18  the scheduling of today's inquest.

19          THE COURT:  Do you know if they're still in

20  business?

21          MR. SCHWEITZER:  I do not.

22          THE COURT:  With the affidavits of service,

23  there were photos of the address where service was

24  attempted, but you don't have any information as to

25  whether this company even exists anymore, do you?

1          MR. SCHWEITZER:  I do know that this company

2     has not been dissolved.  Whether it's still operating

3     at it's registered address is not clear to me.

4     Certainly nobody was present to accept service for the

5     entity.

6          THE COURT:  Thank you very much.

7          Thank you, Ms. Calle.  Thank you, Ms.

8     Suarez.  This concludes our hearing.

9                    * * * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18      I certify that the foregoing is a correct

19 transcript from the electronic sound recording of the

20 proceedings in the above-entitled matter.

21

22

23

24

25 ELIZABETH BARRON                    November 28, 2018